## J. R. HAM, *alias* J. W. HALL, *v.* THE STATE.

1. CONSTITUTIONAL LAW — FORGERY. — Section 5 of the act of July 28, 1876, "to provide for the detection and conviction of all forgers of land titles," enacts that persons out of this state may commit, and be held amenable in the courts of this state for, violations of the act, and may be indicted therefor either in the county of Travis, the county wherein the offense was committed, or the county in which is situate the land involved in the forgery. *Held,* that nothing in these provisions contravenes the Constitution of the United States, or that of this state, nor transcends the powers of the Legislature of this state. *Held, further,* that this section is germane to the title of the act, and is not a special or local law.

2. SAME — EXTRADITION. — Under the provision of the United States Constitution respecting the rendition of fugitives from justice, and the laws regulating the same, a citizen of another state, extradited therefrom to this state, may be here tried for a different offense than that alleged against him in the requisition on which he was extradited to this state. The doctrines of international extradition in this respect, whether based on comity or on treaty stipulations, have no application to extradition cases arising between the different states of the American Union under their common Constitution, whose imperative mandate on this subject is founded on the mutual trust and confidence of the states, and guarded by the guaranty that

each state shall secure to the citizens of her sister states the privileges and immunities she concedes to her own. Note the opinion *in extenso*.

3. SAME — CASE STATED. — Being indicted in Travis County, Texas, under said act of 1876, the accused filed special pleas, alleging that he was not a citizen of Texas, but of Missouri, and had been arrested in the latter state, by virtue of an extradition warrant issued by the governor thereof, on a requisition of the governor of Texas, based on an indictment found in L. County, Texas, for a different offense; that the indictment in the present case was found subsequent to his extradition, and charged the commission of the offense at a date anterior thereto; and that the offense charged in this indictment, if committed at all, was committed in the state of Missouri, and when he was a citizen and resident thereof, and when he was not within the limits or jurisdiction of the state of Texas; wherefore his trial on this indictment would be in violation of the Constitution and laws of the United States and of this state, contrary to public policy, etc. *Held*, that a general demurrer to these pleas was correctly sustained by the court below.

4. FORGERY — VARIANCE. — Indictment alleged that the forged deed purported to be the deed of "Abraham Barnes," but the signature to the deed was "A. Barnes." *Held*, not a variance.

5. SAME — EVIDENCE. — Indictment for uttering, publishing, and using as true a certain false and forged deed, charged that the whole instrument was a forgery, and set it out *in hæc verba*, including the clerk's certificate of acknowledgment. *Held*, not error to allow the state to prove that the certificate was a forgery, as well as the deed itself.

6. PRACTICE. — A state's witness, though under the rule, was allowed to overhear certain evidence, and subsequently, despite defendant's objection, was allowed to testify respecting such evidence. *Held*, a matter confided to the discretion of the court below, and not revisable here unless an abuse of that discretion be apparent.

7. EVIDENCE OF INTENT. — In a trial for uttering a forged instrument, the criminal intent may be shown by proof that the accused, about the time of the offense on trial, possessed or uttered other forged instruments of the same description. See the opinion for the rule on this subject and its limitations.

8. ACCOMPLICE TESTIMONY. — If a state's witness had no complicity in the offense on trial, his testimony is not that of an accomplice, whatever may have been his complicity with the accused in the commission of other offenses.

9. "REASONABLE DOUBT" is best expounded to a jury in the language of the Code of Criminal Procedure, without further explanation.

10. CHARGE OF THE COURT. — In a trial for uttering a forged instrument as true and genuine, it was incumbent on the court below to give in charge to the jury the statutory definition of forgery, or, in lieu thereof, to explain

to them the legal constituents of the offense. Such instructions were an essential part of the "law applicable to the case," which it was the right of the accused to have the court distinctly set forth to the jury.

APPEAL from the District Court of Travis. Tried below before the Hon. E. B. TURNER.

On November 2, 1877, an indictment by the grand jury of Travis County, Texas, was presented to, and filed in, the District Court of said county, against J. R. Ham, *alias* J. W. Hall.

The charging part of the indictment is as follows:

"That James R. Ham, *alias* J. W. Hall, on the twenty-sixth day of September, Anno Domini 1876, in the county of Blanco, in the state of Texas, willfully, feloniously, without lawful authority, knowingly, and with the intent to defraud, did utter, publish, and use as true and genuine, a certain false and forged instrument in writing, then and there purporting to be the act of another person, to-wit, the act of one Abraham Barnes; which instrument in writing was then and there false and forged, and which instrument in writing, in truth and in fact, was then and there not the act of the said Abraham Barnes; and which instrument in writing was then and there well known to the said Ham, *alias* Hall, to be false and forged; and that the said Ham, *alias* Hall, then and there willfully, feloniously, and knowingly, and with the intent to defraud, did cause and direct said false and forged instrument in writing to be filed for record, and to be recorded in a certain office of record within the state of Texas, to-wit, in the office of the clerk of the County Court of the county of Blanco, in said state; and that the said Ham, *alias* Hall, then and there, feloniously and knowingly, and with the intent to defraud, did send said false and forged instrument in writing through the mail, to the clerk of the County Court of said county of Blanco, for the purpose of filing and of record in said office of said clerk of the County Court of said county of Blanco, he, the said Ham, *alias* Hall,

then and there knowing said instrument in writing to be false and forged; and which said false and forged instrument in writing having been made without lawful authority, and with the intent to defraud; and said false instrument in writing having been made in such manner that said false instrument in writing would, if the same were true and genuine, have transferred certain property, to-wit, lands situated in the state of Texas; and which false instrument in writing did then and there relate to and affect lands in said state, and did then and there purport to be a deed of conveyance and transfer of lands in said state from the said Abraham Barnes to one John W. Hall, and purports to bear date on the thirteenth day of September, A. D. 1849; and which false and forged instrument in writing is in words and figures substantially as follows, to-wit."

The alleged false and forged instrument (with certificate of acknowledgment, purporting to have been made before W. R. Baker, clerk Harris County, and to have been signed, W. R. Baker, clerk Harris County, by Thos. M. Bagby, deputy) is set out in full in the indictment.

On December 18, 1877, the appellant filed in the District Court two pleas to its jurisdiction, and on the 26th of the same month he filed what is styled in the transcript an amended plea to the jurisdiction. These pleas were all sworn to and subscribed by the appellant as J. R. Ham.

On December 10th and 11th, demurrers were filed by the State to defendant's first, second, and amended pleas.

On December 14, 1877, the case being called, the special pleas were submitted to the court, and the demurrers were sustained. The defendant was found guilty by the jury, and his punishment assessed at ten years' confinement in the state penitentiary.

On December 15 a motion for a new trial was made and overruled, and notice of appeal given.

Fifteen errors are assigned.

The first five are as follows :

" 1. The court erred in sustaining the demurrer of the State to the plea of defendant to the jurisdiction of the court over the person of the defendant, and to the plea to the jurisdiction of the court as to the subject-matter involved in the indictment.

" 2. The court erred in sustaining the demurrer of the the State to the amended plea of defendant to the jurisdiction of the court over the person of the defendant.

" 3. The court erred in sustaining the demurrer of the State to the plea of the defendant to the jurisdiction of the court over the person of the defendant, as said pleas were amended.

" 4. The court erred in sustaining the demurrer of the State to the plea of the defendant to the jurisdiction of the court over the person of the defendant, and over the subject-matter in both forms : first, as originally presented ; and, second, as amended.  The court, under all the facts of the case, and as exemplified by the evidence, has and had not jurisdiction over the person of the defendant.

" 5. The court, under all the facts of the case as tried, and as exemplified by all the evidence heard on the trial, had no jurisdiction to try the subject-matter alleged in the indictment against this defendant."

As will be seen, the above present as errors the rulings of the court in sustaining the demurrers to defendant's pleas to the jurisdiction of the court.  The substance of those pleas, briefly stated, is :

That the defendant is a citizen of the state of Missouri, and had been for more than fifteen years ; that he was not, and never had been, a citizen of the state of Texas ; that on or about October 17, 1877, he was arrested in the state of Missouri, upon a warrant issued by the governor of that state on or about October 15, 1877, upon the requisition demand, dated on or about October 13, 1877, of the gov-

ernor of the state of Texas; and that the requisition of the governor of Texas was based upon an indictment preferred against defendant by the grand jury of Limestone County, Texas, charging defendant with the crime of forging a deed to land in Texas; that subsequent to the time when he was surrendered to the authorities of Texas, brought into this state, and lodged in the jail of Travis County, the grand jury of Travis County had preferred the indictment in this case; and that said indictment alleged the commission of an offense at a date anterior to the date of the requisition of the governor of Texas upon the governor of Missouri.

A history of this case would necessitate a detail of the testimony of a score or more of witnesses, and the contents of an equal number of documents. This would subserve no useful purpose, as the opinion indicates such matters of fact as are involved in the rulings.

The State's witness Stevens implicated himself, along with Ham, in other forgeries, for which indictments were pending against him in the same court. In no respect, however, does he appear to have had any complicity in, or connection with, the transactions involved in the present case; and he stated that no promises had been made him respecting the indictments against him.

The briefs and arguments filed in this cause are worthy the high reputation of the distinguished counsel who represented the appellant and the State. Of necessity, however, they are elaborate, and space can be afforded for only some of their most salient features.

*Walton, Green & Hill*, and *George F. Pendexter*, for the appellant. Was it lawful to try the defendant on a charge for which he was not extradited, and alleged to have been committed at a date anterior to the inception of the extradition proceedings?

The question is fairly set out in the plea and amended plea to the jurisdiction of the court over the person of appellant. To this plea, as originally framed, and as amended, the State filed demurrer, which was sustained.

On authority and reason, we believe it was error to sustain the demurrer, the facts in the plea being sufficient to bar a prosecution in this case. U. S. Rev. Stat. 1027, sec. 5278; Howe's case, *Law Times* for December, 1877; *Bacharach* v. *Lagrave*, 4 N. Y. Sup. Ct. 215.

The contrary doctrine was held in *Adriance* v. *Lagrave*, 59 N. Y. 110. But the doctrine as announced in this latter case is not only in conflict with the other authorities cited, but is itself fully overthrown by the review of it by Samuel T. Spear, in the *Albany Law Journal* of March 16, 1878, p. 200.

It will be observed, however, that the articles of the treaties discussed in the Howe case (with England), and in the Lagrave case (with France), are couched in terms very similar to the words of our Federal statute before cited; and the discussion is on the legal effect and meaning of the terms of said treaties, as to whether a person extradited under them can be tried for an offense for which the extradition was not made, where the latter offense is of date anterior to the requisition for extradition. Of course, were a person to commit an offense after being extradited, and within the jurisdiction of the extraditing country, he could be tried as could any other person who committed crime within the jurisdiction. But this is not the question to which the attention of the court is directed in this case. It is: If A commit, say three offenses — murder, arson, and rape — all on the same day; or if he commit the crime of forgery three several times, each distinct and separate from the other, and be extradited for the murder alone, could he be tried for the arson? Or, if extradited for one of the forgeries, could he be tried for either of the others? As

stated, the decisions and the discussion were on the rights of the state and defendant under the terms of treaties, and are not of or upon the terms of the Federal statute; nor is it claimed that the decisions are conclusive on the question here, save as the reasoning is unanswerable when applied to the proper construction of the Federal statute. There are no technical treaties between the states of the Union, but we are not afraid of overthrow when we say that the Federal statute stands in lieu of a treaty between the states, and must receive the same construction a treaty would receive if the exact words of the statute were embraced in a treaty between two independent nations. This law, indeed, partakes much of the nature of a treaty. A treaty can only be enforced because it is a treaty, and because the nation called upon to perform consents to perform. A refusal to perform is conclusive, there being no tribunal to give redress, unless war might be called a tribunal. So, in case a state refuse to deliver a fugitive from justice on requisition of a sister state there is no relief, there being no tribunal to enforce a compliance. And a state may not resort to war. *Dennison* v. *Ohio*, 24 How. 66.

Taking the Federal statute as constituting a treaty between the states, and being enforceable as a treaty only, then it would rationally, and logically, and legally receive the construction of a treaty, having only the comity which exists, or should exist, between the states to secure the fulfillment of a duty cast upon state executives; and if construed as a treaty, then the proper construction is clearly pointed out in the cases and discussion before cited. If there be no tribunal to which the case of demand for, and refusal to deliver, a fugitive from justice can be referred for adjudication and settlement, then necessity forces the contending parties to rely on comity, and comity alone. If a demand be made for a fugitive to answer a specific offense, as the law requires, and the demand is honored and fugitive delivered, and

thereafter the demanding state ignores the basis on which
the requisition was made, and places the extradited party
on trial for a wholly different offense, would not comity, as
between such states, be violated? The basis of comity, as
between nations or states, is fairness, candor, and justice,
the one toward the other. To pursue the rule the state of
Texas has done in this case is to practice an open, unjust,
and undisguised deception, not only upon a sister state who
has honored her requisition, but also upon the rights of the
defendant, who was entitled to the protection of the laws of
Missouri until legally and regularly withdrawn from that
protection by due course under the law, that due course
being executed by Missouri under the comity due from her
to Texas. We may be wrong, but do not think so, when we
say that if Missouri could justly complain of aught Texas
may do in the premises here, then such thing would be in
violation of comity, and should not be done by Texas. We
know of no other rule by which to measure the extent of
what Texas may do. Certainly, if the party surrendered
be tried for an offense for which he was not extradited, then
he is tried for an offense for which Missouri has not con-
sented he should be tried. The practical vital point in a
case of this character is the consent of the state (who yields
her citizen) that the extradited party shall be tried. If
such consent be given, then it is a special consent, viz., that
he shall be tried on the charge specified, and on none other.
The jurisdiction obtained is a special and a very particular
one, viz., to try for a specified offense, and this special
jurisdiction is founded on the consent of a state, actuated
solely by the comity which exists between the states.

*H. H. Boone*, Attorney-General, for the State. Two
questions arise: 1. Did the court below err in holding that
the defendant could be lawfully tried on the charge pre-
sented, it being not the crime upon which the demand

was based upon which he had been surrendered, and it being a crime alleged to have been committed by defendant at a date anterior to the date of requisition?

2. Did the court below err in holding that it had jurisdiction to try the defendant, notwithstanding he, defendant, was not personally present in the state of Texas when the crime was charged to have been committed?

The right to demand and the duty to surrender are prescribed and regulated:

1. By the Constitution of the United States:

"A person charged in any state with treason, felony, or other crimes, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime." Const. U. S., art. 10, sec. 2.

2. By a statute of the United States:

"Whenever the executive authority of any state or territory demands any person, as a fugitive from justice, of the executive authority of any state or territory to which such person has fled, and produces a copy of an indictment found, or an affidavit made before a magistrate of any state or territory, charging the person demanded with having committed treason, felony, or other crime, certified as authentic by the governor or chief magistrate of the state or territory from whence the person so charged has fled, it shall be the duty of the executive authority of the state or territory to which such person has fled to cause him to be arrested and secured, and to cause notice of the arrest to be given to the executive authority making such demand, or the agent of such authority appointed to receive the fugitive, and to cause the fugitive to be delivered to such agent when he shall appear. If no such agent appears within six months from the time of the arrest, the prisoner may be discharged. All costs or expense incurred in the apprehending, secur-

ing, and transmitting such fugitive to the state or territory making such demand shall be paid by such state or territory." U. S. Rev. Stat., p. 1027, sec. 5278.

3. By statute of the state of Missouri, viz. :

" Whenever the executive of any other state shall demand of the executive of this state any person, as a fugitive from justice, and shall have complied with the requisites of the act of Congress in that case made and provided, it shall be the duty of the executive of this state to issue his warrant, under the seal of the state, directed to any sheriff, coroner, or other person whom he may think fit to intrust with the execution of such warrant.

" Sec. 2. The warrant shall authorize the officer or person to whom it is directed to arrest the fugitive anywhere within the limits of this state, and convey him to any place therein named, and shall command all sheriffs, coroners, constables, and other officers to whom the warrant may be shown, to aid and assist in the execution thereof." Gen. Stat. Mo., Title XLVIII, p. 869, ch. 220, secs. 1, 2.

Texas has similar statutes. Pasc. Dig., art. 3342 *et seq.*

These statutes, Federal and state, do not " stand in lieu of a treaty between the states ; " they partake in no manner of the " nature of a treaty ;" nor of a compact, or an agreement. Vatt. 192 ; *Holmes* v. *Jennison,* 14 Pet. 662.

Hence there is no " comity between the states " to be invoked or violated.

The right given to " demand" implies that it is an absolute right ; and it follows that there must be a correlative obligation to deliver, without any reference to the character of the crime charged, or to the policy or laws of the state to which the fugitive has fled. *The Commonwealth* v. *Dennison,* Gov., 24 How. 103, *et seq.*

Nor is the right to demand, nor the obligation to deliver, in any degree lessened, nor in any manner affected, because, as it is argued, there may be a refusal on the part of the gov-

ernor to comply with the demand made by the governor of another state, and because, in case of such a refusal, there is no tribunal to enforce a compliance.

Now, between the states the right to demand and the duty to surrender are not confined or limited to any specified crime. The words used in the Constitution and the statute are "treason, felony, or other crime," and they embrace every act made punishable by the laws of the state making the demand. *Kentucky* v. *Dennison*, Gov., 24 How. 99, 100.

It is not necessary that the crime charged should constitute an offense against the common law. In re *William Fetter*, 3 Zab. 311. It is enough that it is a crime against the laws of the state making the demand. *Johnson* v. *Riley*, 13 Ga. 97 ; 9 Wend. 218.

The authority of the state upon which the demand is made cannot go into an examination of the facts of the alleged crime. Nor can the governor upon whom the demand is made look to the sufficiency of the indictment or complaint. 13 Ga. 133, 134 ; 9 Wend. 219–221 ; 24 How. 106.

And the arrest may be made before the demand, and the person accused held, by the authorities of the state in which he may be found, for a reasonable time (which is generally prescribed), until the executive of the state in which the offense was committed shall send the requisition. See statutes of Missouri, cited *supra*, secs. 6–19 ; 1 Pasc. Dig. 551.

Did the court err in not giving to the jury a definition of forgery? The charge asked by the defendant, it is submitted, is not correct; yet if, under the indictment and the evidence adduced on the trial, a definition of forgery was a part of the law applicable to the case, and it "clearly appears that it was absolutely necessary for the protection of any right which the accused might have" ( *Cox* v. *The State*, 41 Texas, 3), then it is conceded a charge should

have been given on this subject. It is contended, however, that such a charge was not necessary, and that the failure or refusal to give it was immaterial.

The defendant was not indicted for false making, forging, or counterfeiting a deed. He was indicted for uttering, publishing, or using a forged and false instrument, knowing it to be such, etc. It was necessary to prove only that the instrument was false or forged, that he knew its character, and that he did any one of the acts of uttering, publishing, or using, as charged in the indictment. This was the offense, and the charge embraces all the law applicable to the case as made by the indictment and developed by the facts proved on the trial. "It is not contemplated that the purpose of the charge is to educate the jury to a knowledge of the general principles of law relating to an offense, * * * as is done by a law lecture upon the subject, whether quoted from the Code or from standard elementary authors. Rather it is expected that the judge, upon due consideration, shall anticipate the conclusion as to the facts to which the jury might properly arrive from the evidence before them, and instruct the jury as to what combination of such facts, if they existed, would excuse or justify the defendant or establish his innocence." *Marshall* v. *The State*, 40 Texas, 282.

Whether the indicted instrument was what it purported to be, or was false or forged, was a question of fact, to be submitted to, and determined by, the jury upon the evidence. This was, in effect, the charge of the court. It may possibly be obnoxious to criticism in some particulars, but, taken altogether, it could not have misled the jury.

In *Tiner* v. *The State*, 44 Texas, 128, cited by counsel for appellant, the court failed and refused to charge the law of self-defense, to which the accused was entitled under the facts proven.

In *Simms* v. *The State*, 2 Texas Ct. App. 110, also cited,

the defendant was indicted and convicted for burglariously, by force and fraud, entering a dwelling-house in the night-time, with the intent to commit the crime of theft of two bed-quilts, of the value of $10. There was in the charge of the court no definition of theft, nor anything equivalent to it. The court held that it was as necessary to charge upon the law of theft as of burglary, "because the latter was made to depend upon the fact that they must believe that the accused *intended* to commit the former;" that the correctness of the charge must be tested by its applicability to the offense charged in the indictment and established by the evidence. The accused in that case was a negro boy; and the evidence was that he was found in the room, in the night, lying fast asleep; when wakened up, he said he came there to get some quilts and a saddle. Of course, it became important for the jury to determine how he expected to get the property; and in order for them to determine whether he intended to steal, it became necessary for the court to tell them what stealing was. And so it will be found in every case where it has been held that it was necessary for the court to give in its charge the definition of an offense; it was because either there were different degrees or grades of the offense charged, or the indictment charged the commission of one offense, with the intention of committing another, where the statute made the criminality of the act charged dependent upon the commission of some other offense, or the intention to commit it.

In the case at bar, the existence of the indicted instrument was an independent, substantial fact. Whether it was false, or forged, or genuine, depended upon no act or intention charged against the appellant. It is respectfully submitted that the failure of the court to tell the jury what would constitute the indicted instrument a false or forged one did not deprive defendant of any right to which he was entitled under the law; and if an error at all, which is not

admitted, it was an immaterial one, for which the judgment should not be reversed.

White, J.　So outrageous had become the wrongs inflicted upon our citizens by means of forged land titles that the framers of our last Constitution incorporated into that intrument the 6th section of article 13, which provides that "the Legislature shall pass stringent laws for the detection and conviction of all forgers of land titles, and make such appropriations of money for that purpose as may be necessary."

In obedience to this requirement, the Fifteenth Legislature, the first which assembled under the new Constitution, on July 28, 1876, passed an act entitled "An act to provide for the detection and conviction of all forgers of land titles," and, on account of the "imperative public necessity" for its immediate operation and execution, declared that it should go into "force and take effect from and after its passage." Gen. Laws 15th Leg. 59, *et seq.*

It was known that a large, if not the largest, proportion of such forgeries had been committed and were being committed by citizens of other states — parties who had never resided in the state of Texas; and to reach this class of offenders was a *desideratum* which induced the adoption of the 5th section of said act, which is in these words, viz.:

"Sec. 5. Persons out of the state may commit, and be liable to indictment and conviction for committing, any of the offenses hereinbefore enumerated, which do not in their commission necessarily require a personal presence in this state, the object of this act being to reach and punish all persons offending against its provisions, whether within or without the state; and indictments under this act may be presented by the grand jury of Travis County, in this state, or in the county in which the offense was committed, or in the county where the land lies about which the offenses in this act were committed." Gen. Laws 15th Leg. 60.

On November 2, 1877, the appellant in this case, under the name of James R. Ham, *alias* J. W. Hall, was indicted by the grand jury of Travis County for having, on September 26, 1876, in the county of Blanco, state of Texas, uttered, published, and used " as true and genuine, a certain false and forged instrument in writing, then and there purporting to be the act of another person, to wit, the act of one Abraham Barnes." Set out in full and copied *hæc verba* into, and as a part of, this indictment, is the alleged false and forged instrument, signed "A. Barnes," and including, also, the certificate of acknowledgment and authentication of the same, purporting to have been made before W. R. Baker, clerk of Harris County, on September 13, 1849, and to have been signed "W. R. Baker, clerk of Harris County, by Thos. M. Bagby, deputy," with the seal of the court attached.

To this indictment the defendant filed two special pleas to the jurisdiction of the court, the substance of which may be stated thus :

" 1. That defendant is not a citizen of the state of Texas, but was and is a citizen of the state of Missouri, in which latter state he was, on October 17, 1877, arrested by virtue of an extradition warrant issued by the governor of Missouri, upon a requisition of the governor of Texas, based upon another and different indictment from the one he was called upon in this case to answer, to wit, an indictment for forgery, preferred against him by the grand jury of Limestone County, Texas ; and that the indictment here exhibited against him was found subsequent to his extradition, and alleged the offense therein charged to have been committed at a date long anterior to the issuance of the requisition and warrant by which he was extradited." And he alleged that to try him on this case, under the circumstances, " would be a violation of the laws of the state of Texas and the United States, contrary to public policy, in violation of good faith; prejudicial to the enforce-

ment of the law in extradition cases, in bad faith to a sister state, unjust to the state of Texas, and subversive of what is believed to be well considered, recognized, and established rights of this defendant, as well as of every other citizen of the United States.

" 2. That the offense named in the indictment, if committed at all, was committed whilst defendant was a citizen of, and within the jurisdiction of, the state of Missouri, and not within the limits and jurisdiction of the state of Texas ; and that, under the Constitution and laws of the United States, a citizen of Missouri cannot be tried in Texas for a crime committed in Missouri ; and that the law seeking to hold him so liable to trial in Texas is unconstitutional and void."

To these two pleas the State, through her attorneys, interposed general demurrers, which were sustained by the court. It is contended that the court erred in its ruling, and the correctness of its action is made the first prominent and important question for adjudication in the bill of exceptions, assignment of errors, and in the able and learned oral arguments and briefs both of the counsel for the appellant and of the attorney-general, on the hearing before this court.

The extradition papers and proceedings are not set out in the transcript of the record before us. If not admitted as a rule of practice by the demurrer to the pleas, the facts stated therein are conceded to be true in the argument, and will be so considered in the discussion of the questions raised.

In the 2d section of article 4 of the Constitution of the United States it is provided that " a person charged in any state with treason, felony, or other crime, who shall flee from justice and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdic-

tion of the crime." The procedure in such cases is regulated by section 5278 of the General Laws of the United States. See Rev. Stat. U. S. 1027.

Most, if not all, the states have passed laws in conformity to, of similar import with, and having for their object the more speedy, certain, and efficient execution of, these laws of the Federal government. For the laws upon this subject, as they exist in the two states immediately interested in the proceedings had in this case, see the General Statutes of Missouri, Title XLVIII, p. 869, ch. 220, secs. 1, 2, and Paschal's Digest of the Laws of Texas, art. 3342, *et seq.*

As between nations, similar regulations in regard to the demand of one government upon another for the arrest and extradition of fugitives from justice are usually settled by the express terms of the treaties adopted for that purpose. In fact, as between nations, it is now the American, as well as British, doctrine that there can be no extradition without the offense for which the party is surrendered is expressly provided for by treaty stipulation. *The Commonwealth* v. *Hawes*, Ky. Ct. App., April 17, 1878 ; Alb. L. J., April, 1878.

As between nations, ordinarily a preliminary trial is had before some judge or magistrate, founded upon complaint made under oath, and upon his arrest the party is brought before the judicial officer, who examines into, and hears the evidence of, criminality, "and if, on such hearing, the evidence be deemed sufficient to sustain the charge," it is made the duty of the examining judge or magistrate to certify the same to the proper executive authority, that a warrant may issue for the surrender of such fugitive.

Where the treaty fails to declare a rule of procedure in any given state of case, the established principles of international law, good faith, and comity are appealed to and applied in the determination of all such questions. For instance, without any treaty stipulation to that effect, it

may now be considered as a well-established doctrine of international extradition that good faith and comity require of the nation to which the fugitive is surrendered that he be tried alone upon the specific offense for which he was surrendered, and that he cannot be held to answer for another and different offense.

This doctrine of international extradition is sought to be made available to appellant in this case, and is the principle upon which his first plea to the jurisdiction of the court is based. It is contended that "it is due to good faith and comity, to the sovereignty of the states as distinct political communities, to the terms of their intercourse with each other in demanding and surrendering fugitives from justice, and to the intent of the Constitution in providing the remedy, that when one state in this way obtains from another the custody of a person, it should limit that custody to the purpose for which it was obtained and which was avowed by it when obtaining it; and hence, when this purpose has been answered, the state demanding and receiving the fugitive should secure to him freedom of departure and return to the state from which he was removed." It is said, "if this is not the law, it ought to be."

We cannot concur in the doctrine thus enunciated. The relations between the states, as created by the general government, render their *status* and intercourse different in most material respects, civilly and politically, from that subsisting between separate and independent nations. And this difference is especially apparent in the difference, heretofore alluded to, existing as to the modes of procedure in extradition matters. As was said by Savage, C. J., in "The matter of Clark:" "Civilized nations have seen the necessity and propriety of surrendering fugitives from justice, that they may be tried by the laws of the country in which the offense was committed. This matter has usually been arranged by treaty; but when no treaty exists,

the comity of nations requires that the offenders of one nation shall not find a sanctuary in another. In such cases, a state or nation which is required to surrender an individual who is under the protection of its laws owes it to itself, as well as to the individual concerned, to institute an examination into the facts alleged to constitute the crime, and to surrender the person charged if, upon such examination, there appears satisfactory evidence of guilt. Where a treaty exists, the evidence of the commission of the crime, as well as the circumstances under which the surrender is to be made, will, of course, be explicitly stated, and in practice pursued.

" Had our Federal Constitution and laws been silent on the subject, and no conventional arrangement existed between the several states composing our confederacy, it may be conceded that the practice arising from the comity of nations would be applicable ; and, before we would surrender any person demanded as a fugitive from justice, it would be our duty to examine into the facts of the alleged crime, and be satisfied that no reasonable doubt existed as to his guilt. But under our Federal government this matter has been regulated, and we are not left to the uncertainty arising from an inquiry in one state into the particulars of an offense committed in an another. The Constitution of the United States provides that ' a person charged in any state with treason, felony, or other crime, who shall flee from justice, and be found in another state, shall, on demand of the executive authority of the state from which he fled, be delivered up, to be removed to the state having jurisdiction of the crime.' Here, then, is the law on the subject — a positive regulation, and tantamount to a treaty regulation — and we are not to resort to the comity of nations for our guidance. Every person who is *charged* with an offense in any state, and shall flee to another state, shall be delivered up. It is not necessary, as under the comity of nations,

to examine into the facts alleged against him constituting
the crime; it is sufficient that he is charged with having
committed a crime." 9 Wend. 218; *The State* v. *Schle-
man,* 4 Harr. 577; *Nichols* v. *Cornelius,* 7 Ind. 611; Ex
parte *Pfitzer,* 7 Ind. 440.

Another and a striking view of the question is this: In
their relations and intercourse, nations are naturally jeal-
ous and suspicious of each other; hence the exactitude of
their treaty stipulations. Not so with the states. Mutual
confidence and trust were the foundation-stones and pillars
upon which they erected the Federal edifice, and their ex-
pressed purpose in its creation was "to form a more per-
fect union, establish justice, insure domestic tranquility,
provide for the common defense, promote the general wel-
fare, and secure the blessings of liberty to the citizens and
their posterity." It was, at the same time, further declared
that "the citizens of each state shall be entitled to all priv-
ileges and immunities of citizens of the several states."
Art. 4, sec. 11. These privileges and immunities are lim-
ited, it is true, to such as are *fundamental,* but these em-
brace all the dearest and most sacred of all human rights —
the protection of life, liberty, and property. *Corfield* v.
*Coryell,* 4 Wash. C. Ct. 380.

"The interest and purpose of this clause was to declare
to the several states that whatever those rights, as you
grant or establish them to your own citizens, or as you
limit or qualify them, or impose restrictions on their exer-
cise, the same, neither more nor less, shall be the measure
of the rights of citizens of the other states within your jur-
isdiction." *Crandall* v. *Nevada,* 6 Wall. 36; *Frasher* v.
*The State,* 3 Texas Ct. App. 263.

It was the implicit faith and confidence which each had in
the other's honor and integrity in maintaining this guar-
anty that the life, liberty, and property of her citizen would
be protected in any other state to which he might go or be

sent, to the same extent and by the same laws which shielded and protected the individual citizen of that other state, that induced the enactment of the extradition provision in the Constitution, quoted above, in the mandatory and positive language used. The language used is, he *shall on demand be delivered* up; not *may*, if you feel so inclined; not shall, after you have examined into the matter and found him guilty as charged, but the delivery shall be made if the process is regular, and you must — are in honor bound to do so — by the Federal compact, knowing that your sister is also bound in honor and good faith to protect him as she would one of her own sons. Honor, good faith, and comity, as well as the injunctions of the supreme law of the land, all concur to make this a *duty*, which the executive authority upon whom the demand is made should not dare to question. *Work*, Agent of North Carolina, v. *Carrington*, Sup. Ct. Ohio, April 23, 1878; Law Rep., p. 629, vol. 6, No. 20. If, as a citizen of a common country, he is protected by the ægis of a common Constitution, and, as such citizen, is established in his rights to all the privileges and immunities of citizenship in each state forming an integral part of the common country, is it more than simple justice that he should also share the correlative burdens and incur the penalties which are imposed upon the individual citizen for violations of the state law? We think not. All that can or should be reasonably and legitimately claimed for him is, that he be deprived of no right except by due course of the law of the land; and, to this end, he is guarded by the highest considerations of honor on the part of the state to which he is surrendered.

Suppose, then, as in the case at bar, he is surrendered and extradited, can he be tried for any other offense than the one for which he was extradited? Where is the prohibition? Good faith and comity leave that entirely to the discretion of the state which had the right to demand him

for any crime which he committed, and which, having once rightfully obtained jurisdiction of his person, is only limited in her treatment of him to the responsibility of seeing that the same privileges and immunities which her laws would afford to one of her own citizens are extended and guaranteed to him.

Since the able briefs, both of the learned counsel for the appellant and Attorney-General Boone, for the State, were prepared in this case, this identical question here discussed was submitted "in the matter of Noyes," upon *habeas corpus*, before the United States District Court for the District of New Jersey, May 27, 1878, and it was *held* that "a fugitive from justice, extradited, under the act of Congress, from one state in the Union, on the charge of the commission of a specific crime, can be held by the courts of the state to which he is surrendered for trial for another and different crime." Nixon, J., delivering the opinion in that case, most pertinently and pointedly remarks: "But here a court of competent jurisdiction has the custody of a person who is charged with the commission of certain offenses against the laws of the state. The answer to the charge is, that some other person has done a wrong to the prisoner by violating the laws of another state in arresting him without proper authority. In a criminal case this can hardly be reckoned a pertinent response. It is a claim on the part of the accused that his criminal violations of the law are to be condoned by his personal injuries. It is asking the court to suspend its responsible duties, to wit, the trial of offenders against the Penal Code of the state, while the persons charged with the crime are instituting preliminary investigations into the methods adopted to bring them within its jurisdiction. Such a course, for obvious reasons, is allowable in a civil suit between private litigants; but, for like obvious reasons, cannot be, and never has been, allowed in criminal proceedings, where the object of the prosecution

is to punish the offender against the public.  On a claim of this sort the court says to the prisoner: ' You are going too fast.  We will consider one thing at a time, and every thing in its regular order.  The precise matter which now concerns you and the court is whether you are guilty of the crime charged against you.  As you happen to be found within our jurisdiction, we will first settle that question, and afterwards, if need be, will inquire into the circumstances attending your rendition for trial, or will leave the respective governments to discuss them, or will remit you to the recovery of such damages as you may be able to obtain in the civil courts for the violation of your rights of person.'  All the authorities of Great Britain and the United States, when carefully distinguished and interpreted by their circumstances, support this view of the law.''  See this case reported in the *Texas Law Journal,* p. 330, vol. 1, No. 42.

We have been led into this lengthy discussion of interstate extradition, as well because of the general interest which the subject is at present commanding throughout the country, as the earnestness and ability with which it has been argued before us.

We now turn to the questions raised by the second plea to the jurisdiction, which are that the 5th section of the act of July 28, 1876 (quoted *supra*), is unconstitutional; and that, under the laws of the United States, a citizen of Missouri cannot be tried in Texas for a crime committed in Missouri.

The constitutional objections are:  1. That the subject-matter of this section is not embraced in, nor germane to, the object expressed in the title.  Const., art. 3, sec. 35, 2. Because it is a special or local law.  Const., art. 3, sec. 56.

Neither of these objections are tenable.  With regard to the first, we might simply content ourselves with quoting

the title of the act, which is, "An act to provide for the detection and conviction of all forgers of land titles," and certainly is comprehensive enough to embrace every class and character of land forgers and land forgeries. And the 5th section only provides for one of the classes legitimately belonging to the general head. As was said by Wheeler, J., in *Tadlock* v. *Eccles:* " The terms employed in the title of the act are sufficiently significant of the subject of its provisions, and that was what the clauses in the Constitution intended. *  *  *. Various and numerous provisions may be necessary to accomplish the one general object which an act of the Legislature proposes. Nor could it have been intended that no act of legislation could be constitutional which had reference to the accomplishment of more than one ultimate end. For an act, having one main or principal object in view, may incidentally affect, or be promotive of, others ; and it would be impossible so to legislate as to prevent this consequence. The intention, doubtless, was to prevent embracing in an act having one ostensible object provisions having no relevancy to that object, but really designed to effectuate other and wholly different objects, and thus conceal and disguise the real object proposed by the provisions of an act under a false or deceptive title." 20 Texas, 782. See the whole subject elaborately reviewed in *Giddings* v. *San Antonio*, and the leading authorities there cited, 47 Texas, 548 ; *Haselmeyer* v. *The State*, 1 Texas Ct. App. 690.

As to the second objection, viz., that it is a special or local law, it will be found that the section does not come within the purview of such laws, as construed by our Supreme Court in *Beyman* v. *Black*, 47 Texas, 558, and by this court in *Lastro* v. *The State*, 3 Texas Ct. App. 363.

Nor has any constitutional provision been violated by the Legislature in providing that indictments arising under the act might be presented in Travis County, no matter in

what county the forgery was committed and intended to operate. The same may also be said of the other position, that a citizen of Missouri could not be tried in Texas for an offense committed by him in the state of Missouri. The two propositions are, in the main, similar, and the same general principles of law underlie and control the authority in the Legislature to enact such laws. These principles are concisely stated by Mr. Bishop in his work on Criminal Procedure. He says:

"Another thing is, that the locality of the crime is not necessarily in law, or always in fact, in the same county with the personal presence of him who commits it. We have, indeed, seen that to constitute a crime, an evil intent must combine with the evil act; but, though we usually contemplate the intent as existing in the mind, and the mind as inhabiting the body, yet, legally, instead of this the intent follows, and dwells with the act, and this may be where the bodily presence is not. Thus, if a man stands upon shore within a county, and, by discharging firearms, kills another upon the high seas, without the county, he is triable for the murder by the admiralty, which has jurisdiction over the locality where the ball took effect, and not over the place where he stood to perpetrate the crime. And one who poisons another by the help of an innocent agent is guilty of murder in the county where the murder took place. So, a person who puts forth a libel, or threatening letter, or a letter inclosing a forged instrument, intending to defraud one to whom it is addressed, or a letter making a false pretense to a person who, thereupon, parts with his goods in the county where he receives it, or soliciting one to commit a crime, may be indicted in the county to which it is sent, though he does not go there himself." And he concludes, from the doctrine thus laid down, " It follows that a man may commit a crime against a state or county upon whose soil he never placed his foot." 1

Bishop's Cr. Proc., 2d ed., sec. 53; 1 Bishop's Cr. Law, secs. 109, 110, 112, 556; *The Commonwealth* v. *Harvey*, 8 Am. Jur.; *The People* v. *Adams*, 3 Denio, 190; *The Commonwealth* v. *Smith*, 11 Allen, 244.

Upon the other point, the validity of the law in conferring jurisdiction upon the District Court of Travis County, the doctrine, as stated by Mr. Bishop, is thus laid down: "But if a statute creates an offense which in terms must consist of acts both within and without the state, an indictment will lie in that county within the state in which what we may call the domestic part of the transaction is performed." 1 Bishop Cr. Proc., sec. 56. This is admitted to be the general rule. It is, however, merely technical (*Henderson* v. *The State*, 14 Texas, 517), and is subject to the power of the Legislature to extend the jurisdiction in cases where it is not deemed necessary thus to limit it (1 Hale P. C. 706), if not prohibited by constitutional provisions. The right to be tried in any particular court or county is neither an absolute nor a vested right. *March* v. *The State*, 44 Texas, 76. Where not restricted by the Constitution, questions of venue and jurisdiction are subjects of legislative control. In the states, primary power for all purposes of civil government, where not expressly or impliedly withheld by the Constitution, is in the Legislature. Cooley's Const. Lim., side pp. 88, 89.

We are apprised of no constitutional provision which restricts or limits the power of the Legislature in this state from declaring that the cases arising under this act should be tried in the county of Travis.

After the demurrer to the defendant's two pleas to the jurisdiction was sustained, the case proceeded regularly to a trial, which resulted in the conviction of the accused, with his punishment assessed at ten years' imprisonment in the penitentiary. During the trial there was scarcely a particle of testimony introduced by the State which was not objected

to by the defendant. We are of opinion that all these objections, as they appear in the different bills of exceptions — save, perhaps, three — are so nearly and substantially allied in their nature that they may be treated together and the same general principles of law be made applicable to them.

The three not belonging to the general class are:

1. That the indictment charges that the forged deed purported to be the act of Abraham Barnes, while the proof offered is a deed signed "A. Barnes," and that there was no proof *aliunde* to connect Abraham with A. Barnes as being one and the same person. The answer to this objection is that the entire deed is set out *in hæc verba;* that the deed itself recites, in the description of the parties thereto, that it is the act of "Abraham Barnes, of the county of Cooper, in the state of Missouri, of the first part;" and that the initial letter "A," in the signature, "A. Barnes," to the instrument does not contradict or vary the recitals in the body of the instrument, since it stands as well for "Abraham" as any other christian name commencing with an "A."

Reeves' case is directly in point. The indictment, which was for forging a script receipt, charged that the prisoner forged it " with the name of C. Olier thereunto subscribed, purporting to have been signed Christopher Olier," and it was objected that it must necessarily be bad, as C. Olier "did not on the face of it purport to be Christopher, but might be Charles, etc." But the court held that the script receipt was not upon the face of it repugnant to the bill, or inconsistent with itself. 2 Leach, 808, 814; 2 East P. C., p. 984, ch. 19, sec. 56; 2 Archb. Cr. Pl. & Pr., Waterman's notes, 7th ed., 804, 805; 1 Whart. Cr. Law, 7th ed., sec. 607 *a.*

2. It was objected that, because it was not specifically charged in the indictment, therefore the court erred in admitting proof that the clerk's certificate of the acknowl-

edgement to the deed was also a forgery. The answer is that the whole instrument was declared to be a forgery, and, as said before, was set forth *hæc verba*, including the authentication of the clerk. The certificate was a part, as well as any other portion, of the instrument, and the certificate of acknowledgment was essential to give the appearance of validity to the deed, and necessary for registration purposes, which was another step requisite to perfect the object of the forgery. *Henderson* v. *The State*, 14 Texas, 503.

3. It is contended that the court committed a grave error in permitting the witness Stevens, who, with other witnesses, had been placed under the rule, to remain in the court-room and hear certain testimony which was introduced by the State, and with regard to a portion of which he was himself subsequently examined. The manner in which witnesses are to be examined must, in general, be left to the discretion of the court; and it is believed that the discretion thus confided to the court was intended not to be a subject of revision by the appellate court, unless it be made to appear that the discretion has been abused to defeat the ends of justice. *Roscoe* v. *The State*, 41 Texas, 363; *Sherwood* v. *The State*, 42 Texas, 501; *Kemp* v. *The State*, 38 Texas, 111; *Treadway* v. *The State*, 1 Texas Ct. App. 668; *Goins* v. *The State*, 41 Texas, 334; *Brown* v. *The State*, 3 Texas Ct. App. 294; *Jones* v. *The State*, 3 Texas Ct. App. 150; *Lister* v. *The State*, 3 Texas Ct. App. 17. In this instance the record does not show that the court abused its discretion, or that any material injury was done the defendant.

All the other objections to the admissibility of the evidence are believed to come within the same general rule, as stated by Mr. Greenleaf. He says: "In proof of the criminal uttering of a forged instrument, it is essential to prove guilty knowledge on the part of the utterer. And to

show this fact, evidence is admissible that he had about the same time uttered, or attempted to utter, other forged instruments of the same description; or that he had such others, or instruments for manufacturing them, in his possession; or that he pointed out the place where such others were by him concealed; or that, at other utterings of the same sort of papers, he assumed different names; or that he uttered the paper in question under false representations made at the time, or the like. But when such other instruments, said to be forged, are offered in proof of guilty knowledge, there must be strict proof that they are forgeries. And when evidence is given of other utterings, in order to show guilty knowledge in the principal case, the evidence must be confined to the facts of the prisoner's having uttered such forged instruments, and to his conduct at the time of uttering them; it being improper to give evidence of what he said or did at any other time, collateral to such other utterings, as the prisoner could not be prepared to meet it." 3 Greenl. on Ev., sec. 111; *Gilbraith* v. *The State*, 41 Texas, 567. And Mr. Wharton says: "It is admissible to produce evidence of a distinct crime to prove *scienter* or make out *res gestæ*, or to exhibit a chain of circumstantial evidence in respect to the act charged." 1 Whart. Cr. Law, 7th ed., secs. 631–635, 650; *Speights* v. *The State*, 1 Texas Ct. App. 551; *Henderson* v. *The State*, 14 Texas, 412 *et seq.*; *Persons* v. *The State*, 3 Texas Ct. App. 240.

Upon the charge of the court there are three points made, which we deem it necessary to advert to and discuss: (1) the refusal of the court to instruct the jury upon the rules of law applicable to the testimony of an accomplice; (2) the charge, as given, defining a reasonable doubt; (3) the failure of the charge to define the crime of forgery.

1. It is claimed that the witness Stevens was an accomplice, or at least a *particeps criminis*, who was under indictment himself for forgeries committed in connection with

the defendant, and that, to all intents and purposes, his re-
lation to the case was of such character that the law required
his corroboration before a legal conviction could be had
upon his evidence. Pasc. Dig., art. 3118. It has frequently
been held that article 3118 does not apply to accom-
plices in a technical sense, but to all witnesses who were
*particeps criminis*, whether as principals or 'accessories.
The term " accomplice " was not used in its restricted or
technical sense.     *Williams and Smith* v. *The State*, 42
Texas, 392; *Barrera* v. *The State*, 42 Texas, 260; *Irvin* v.
*The State*, 1 Texas Ct. App. 301.

We do not think the witness Stevens occupied such rela-
tion to the case as that he came within any of the classes
requiring corroboration.    He was not, jointly with the de-
fendant, or even separately, indicted for the forgery in
question.    There was no complicity shown, so far as this
particular witness was concerned, as was the case in *Davis*
v. *The State*, 2 Texas Ct. App. 588; *Myers* v. *The State*,
3 Texas Ct. App. 8; *Carroll* v. *The State*, 3 Texas Ct. App.
117; *Nourse* v. *The State*, 3 Texas Ct. App. 304; *Jones* v.
*The State*, 3 Texas Ct. App. 575.    Nor was he even prom-
ised exemption and immunity from prosecution on the in-
dictments pending against him, in the event of his turning
state's evidence in this case.

In fact, so far as this particular case is concerned, there
is nothing going to establish, directly or indirectly, his
guilty connection, or any connection whatever, with the
transaction, either as a principal or accomplice, accessory,
or *particeps criminis*.    See *Welsh* v. *The State*, 3 Texas Ct.
App. 413, for a full discussion of these different relations
between offenders.

2. Upon the reasonable doubt the court says, in explana-
tion of its character : " By a reasonable doubt is not meant
a speculative or whimsical doubt ; still, you should be so well

satisfied of the truth of the charge that you would not hesitate to act upon the faith of your convictions of his guilt in matters of importance and vital moment in the affairs of life affecting your own interest."

In *Brown* v. *The State*, 1 Texas Ct. App. 154, it was said " that the reasonable doubt was such a doubt as fairly and naturally presented itself from the facts which the jury believed to be true; that the rule was that all the material facts which they believed to be true should lead their minds in such a manner to the conclusion, to a moral certainty, that the defendant was guilty, as that they could not reasonably believe otherwise."

In *Massey* v. *The State*, 1 Texas Ct. App. 564, it was said : " A reasonable doubt, such as would entitle the defendant to an acquittal, need not necessarily arise out of the evidence ; it may be the result of a want of testimony sufficient to satisfy the mind." And in *Chapman* v. *The State*, 3 Texas Ct. App. 67, it was said : " A reasonable doubt is that state of case which, after the entire comprehension and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction, to a moral certainty, of the truth of the charge."

If any further explanation or definition of the " reasonable doubt " is necessary, it is believed that these are the most satisfactory which we have seen given. But, as was said in Massey's case, and repeated in Chapman's case, in the opinions of this court, " the term ' a reasonable doubt ' is pretty well understood by every man of common sense. It would be difficult to use words better understood, and to define their meaning better than those words do themselves ; " and, further, that " if the court would give in charge to the jury the exact language of article 3105 (Pasc. Dig.) of the Code of Criminal Procedure,_the jury would be quite as well in-

formed as to the meaning of the term 'reasonable doubt' as they would after a labored effort to explain it." *Bland* v. *The State, ante*, p. 15.

Before giving in charge the extract above quoted, the correct rule, as prescribed in article 3105 (Pasc. Dig.), was given by the court in the words of the statute. It is insisted that the explanation was not correct, and we are inclined to think that it was calculated rather to confuse and mistify them than to make plainer that which needed no explanation. Still, had this been the only objection to the charge, we might, perhaps, not have considered it of sufficient moment and importance to have required an interference with the verdict and judgment.

3. There is, in our estimation, a graver and more serious objection to the charge, and one which makes it necessary for us to reverse the judgment and remit the case for a new trial. It is the failure of the court, in any portion of the charge, to give the statutory definition of forgery, or any explanation of the nature, elements, and ingredients of that offense, in lieu of such a definition, as would sufficiently apprise the jury of the legal ingredients essential to constitute that crime.

The act of July 28, 1876, under which the prosecution was conducted, does not change or affect the definition of forgery as contained in the statute. Pasc. Dig., art. 2093. Its object was not to define a new offense, or a new class of offenses, but was, as stated in the title or caption of the act, " to provide for the detection and conviction of all forgers of land titles." As was correctly stated in the judge's charge, the first, and in fact the main, question to be determined by the jury was, " Is the deed set out in the indictment a false and forged deed?" But how were the jury to know whether it was false and forged, unless they were apprised, by appropriate instructions,

what, in contemplation of law, would constitute a false and forged instrument? The specific crime of forgery is made up of certain acts and things which must combine in order to constitute it. The statute reads: " He is guilty of forgery who, *without lawful authority*, and with intent to *injure* or *defraud*, shall make a false *instrument in writing*, purporting to be the act of *another*, in such manner that the false instrument so made would (if the same were true) have created, increased, diminished, discharged, or defeated any *pecuniary obligation*, or in any manner have affected any property whatever." Art. 2093.

As was said in *Shanks* v. *The State*, " it is an essential element of the crime of forgery that the false instrument in writing shall have been made without lawful authority. The want of lawful authority to make the instrument in writing is what makes the instrument false. If the instrument in writing is one which the defendant had a right to make for himself, or lawful authority to make for another, then it cannot be false." 25 Texas Supp. 326. The intent to defraud is of the essence of the crime ; it is essential that it shall purport to be the act of another. *Henderson* v. *The State*, 14 Texas, 503.

The jury were not instructed or advised with regard to any of these essential matters and things pertaining to the crime of forgery, and to that extent the jury must have acted in ignorance of them. Whether this verdict would have been different had they been so instructed is not for us to inquire. A defendant in a criminal accusation is entitled to have the jury charged in the law applicable to the case, and it shall be distinctly set forth. Pasc. Dig., art. 3059 ; *Johnson* v. *The State*, 1 Texas Ct. App. 118 ; *Tiner* v. *The State*, 44 Texas, 128 ; *Lockwood* v. *The State*, 1 Texas Ct. App. 749 ; *Sims* v. *The State*, 2 Texas Ct. App. 110 ; *Williams* v. *The State*, 3 Texas Ct. App.

316; *Hodges* v. *The State*, 3 Texas Ct. App. 470; *Cody* v. *The State, ante*, p. 238.

Because the charge of the court did not sufficiently instruct the jury in the law applicable to the case, the judgment of the lower court must be reversed and the cause remanded for a new trial.

*Reversed and remanded.*